# Exhibit 1

Keith W. Heard (KH-8578)
Burke & Parsons
100 Park Avenue
New York NY  10017-5533
(212) 354-3800

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



|  |  |
|---|---|
| HAWKNET LTD.,<br><br>           **Plaintiff,**<br><br>  -against-<br><br>OVERSEAS SHIPPING AGENCIES;<br>OVERSEAS WORLDWIDE HOLDING<br>GROUP; HOMAY GENERAL<br>TRADING CO. LLC; MAJDPOUR<br>BROS CUSTOMS CLEARANCE,<br>MAJDPOUR BROS INTERNATIONAL<br>SEA & LAND TRANSPORT S.A.; GULF<br>OVERSEAS LLC; GULF OVERSEAS<br>GENERAL TRADING LLC and MOS<br>OVERSEAS SHIPPING<br>VERMITTLUNG GMBH,<br><br>           **Defendants.** | **AMENDED**<br>**VERIFIED COMPLAINT**<br><br>07 CV 5912 (NRB) |

Plaintiff, HAWKNET LTD. (hereinafter "Plaintiff"), by its attorneys Burke & Parsons, as and for its Amended Verified Complaint against Defendants, OVERSEAS SHIPPING AGENCIES; OVERSEAS WORLDWIDE HOLDING GROUP; HOMAY GENERAL TRADING CO. LLC; MAJDPOUR BROS CUSTOMS CLEARANCE, MAJDPOUR BROS INTERNATIONAL SEA & LAND TRANSPORT S.A.; GULF OVERSEAS LLC; GULF OVERSEAS GENERAL TRADING LLC and MOS OVERSEAS SHIPPING VERMITTLUNG GMBH, alleges upon information and belief as follows:

1.   This action involves a claim for the breach of a maritime contract, which is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. This action also arises under the Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333.

## THE PARTIES

2.   At all times relevant hereto, Hawknet Ltd. was and still is a foreign corporation organized and existing under and by virtue of the laws of England with an office and place of business at 27-37 St. George's Road, Wimbledon SW19 4EU, England

3.   At all times relevant hereto, Defendant Overseas Shipping Agencies ("OAS") was and still is a corporation organized and existing under and by virtue of the laws of a foreign country with an office and place of business at 2nd Floor, Kafrang Bldg., No. 135, North Kheradmand Avenue, Tehran 15859, Iran.

4.   At all times relevant hereto, Defendant Overseas Worldwide Holding Group was and still is a corporation or other business entity organized and existing under and by virtue of the laws of a foreign country with an office and place of business at 2nd Floor, Kafrang Bldg., No. 135, North Kheradmand Avenue, Tehran 15859, Iran.

5.   At all times relevant hereto, Defendant Majdpour Bros Customs Clearance ("MBCC") was and still is a corporation or other business entity organized and existing under and by virtue of the laws of a foreign country with an office and place of business at 2nd Floor, Kafrang Bldg., No. 135, North Kheradmand Avenue, Tehran 15859, Iran.

6.   At all times relevant hereto, Defendant Majdpour Bros International Sea & Land Transport S.A. ("MBISLT") was and still is a corporation organized and existing under and by virtue of the laws of a foreign country with an office and place of business at 2nd Floor, Kafrang Bldg., No. 135, North Kheradmand Avenue, Tehran 15859, Iran.

7.   At all times relevant hereto, Defendant Homay General Trading Co., LLC ("Homay") was and still is a corporation organized and existing under and by virtue of the laws of a foreign country with an office and place of business at P.O. Box 26370/52370, Dubai, United Arab Emirates.

8.    At all times relevant hereto, Defendant Gulf Overseas LLC ("GOL") was and still is a corporation organized and existing under and by virtue of the laws of a foreign country with an office and place of business at P.O. Box 41309, Dubai, United Arab Emirates.

9.    At all times relevant hereto, Defendant Gulf Overseas General Trading LLC ("GOGT") was and still is a corporation organized and existing under and by virtue of the laws of a foreign country with an office and place of business also at P.O. Box 41309, Dubai, United Arab Emirates.

10.    At all times relevant hereto, Defendant MOS Overseas Shipping Vermittlung GmbH ("MOS") was and still is a corporation or other business entity organized and existing under and by virtue of the laws of a foreign country with an office and place of business at Neuer Wall 8, D-20354, Hamburg, Germany.

## THE CLAIMS

11.    Pursuant to a voyage charter party on an amended GENCON 1976 form dated at London on June 15, 2005 (the "Charter"), Plaintiff, as disponent owner, agreed to charter three vessels, the names of which were to be nominated, to Defendant OAS, as charterer, for the carriage of three cargoes of steel plate from Gdansk, Poland to Bandar Imam Khomeini, Iran. A copy of the Charter is attached hereto as Exhibit A.

12.    At all times relevant hereto, Plaintiff was the disponent owner of the M/V MASTRO GIORGIS II (hereinafter the "Vessel"), the first vessel nominated for service under the Charter. It turned out to be the only vessel nominated for service under the Charter because OAS defaulted in performing the balance of the contract.

13.    Under the terms of Clause 1 of the Charter, Defendant OAS bound itself to ship the cargo described as "total 75,000mt of steel plates in 3 cargoes of 25,000mts plates". Pursuant to Box 9 of the Charter, the first part of the cargo should have been available for loading on July 1, 2005. However, in breach of its duties, Defendant OAS failed to have cargo available for loading on July 1, 2005, resulting in delays to the Vessel for which Plaintiff seeks to recover $78,800.16 by way of damages for detention.

14.    Bills of lading for the first shipment were signed on July 12, 2005 and pursuant to various provisions of the Charter, Defendant OAS should have paid freight for

cargo shipped on the Vessel in the amount of $1,362,199.15 by July 29, 2005, at the latest. However, said Defendant breached the Charter such that Plaintiff did not receive the freight until August 22, 2005. Accordingly, Plaintiff seeks to recover damages in the sum of $40,554.50 by way of interest for late payment of an amount due under the Charter.

15.   Pursuant to Box 12 of the Charter, Defendant OAS contracted to nominate cargoes for two shipments in addition to the one that was transported on the Vessel. Further, under Clause 1 of the Charter, said Defendant bound itself to ship "the cargo", as described in Box 12, which is to say the entire program of three shipments. However, said Defendant only shipped one cargo of 25,000 metric tons of steel plate. As a result, Plaintiff suffered damages and claims deadfreight for the remaining cargo of 50,000 metric tons at the contractual freight rate of $55.25 per metric ton, for a total of $2,762,500.00.

16.   As an excuse for nonperformance of the remaining two shipments under the Charter, Defendant OAS alleged that a company named "Safa" had terminated a contract with said Defendant for the remaining 50,000 metric tons of steel plate to be loaded at Gdansk. However, this is not true since Plaintiff determined that said Defendant chartered another vessel, the M/V KONKAR THEO, to carry the second cargo from Gdansk and yet another vessel to carry the third and last cargo, both of which should have been shipped on tonnage provided by Plaintiff under the Charter, had Defendant OAS not defaulted on its obligations under that contract.

17.   If Defendant OAS had performed the second and third voyages under the Charter, it would have owed Plaintiff freight in the total amount of $2,762,500.00. Plaintiff has calculated the expenses it likely would have incurred had it chartered in vessels and carried cargo for said Defendant on those two voyages. Subtracting those expenses from the freight that would have been owed by Defendant OAS, Plaintiff has determined that it suffered a loss, in terms of lost profits, of $804,980 on the second voyage and a loss, again in terms of lost profits, of $813,665.00 on the third voyage. Thus, Plaintiff's lost profits on the two unperformed voyages add up to $1,618,645.00.

18.   As a result of Defendant OAS' breaches of the Charter, as set forth in paragraphs 13 – 17 above, Plaintiff has sustained damages in the total principal amount of $1,737,999.66, exclusive of interest, costs and attorneys' fees.

VERIFIED COMPLAINT

19. Pursuant to Clause 21 of Part I and Clause 54 of the Additional Clauses of the Charter, all disputes arising thereunder are to be submitted to arbitration in London and are to be governed by English law.

20. Plaintiff has previously commenced arbitration against Defendant OAS in accordance with the terms of the Charter.

21. In addition to an attachment in the full principal amount of the claim as stated in Paragraph 17 above, Plaintiff also seeks an attachment over an additional sum to cover estimated interest as well as its anticipated attorneys' fees and costs, all of which are routinely recoverable under English law in London arbitration. (*See Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263, 265 (2d Cir. 2002), where the attachment that the Court of Appeals reinstated covered "an amount that includes interest and anticipated attorneys' and arbitrators' fees.")

22. Plaintiff estimates, as nearly as can be presently computed, these additional damages and costs to be $631,037.13, consisting of interest in the sum of $556,037.13 (computed on the principal amount sought at a rate of 7% for a period of four years, consisting of two years since the time of Defendant OAS' breaches and failure to perform, plus an additional two years for the arbitration to run its course), and $75,000 in estimated U.K. counsel fees, costs, and arbitrators' fees, which will be incurred in conjunction with the London arbitration and which are recoverable there.

23. Based upon the foregoing, therefore, the total sum sought to be attached in this action with respect to Plaintiff's claims is $2,369,036.79.

24. For its part, Plaintiff has satisfied and performed all of its obligations under the terms of the Charter.

## RELATIONSHIPS AMONG THE DEFENDANTS

25. Upon information and belief, all of the defendants are part of an Iranian business entity named Overseas Worldwide Holding Group, which maintains a unified website at www.overseasgrp.com. In addition, the primary address and principal place of business for the Group is 2nd Floor, Kafrang Bldg., No. 135, North Kheradmand Avenue, Tehran 15859, Iran. The group is controlled and dominated by the Majdpour Brothers, who include *inter alia* Tawfiq, Sina and Majid Majdpour.

26.   Upon information and belief, the Majdpour Brothers use the various companies and business entities in the Group as interchangeable parts, depending on the business, commercial and legal needs of the Group at any given time.

27.   In the first voyage under the Charter, which is described in paragraphs 13 and 14 above, defendant OAS owed Plaintiff freight for cargo shipped on the Vessel in the amount of $1,362,199.15.  However, that amount was not paid by said defendant but, pursuant to instructions from Sina Majdpour, was paid instead by defendant Homay, which Sina Majdpour described to Plaintiff in an email dated August 20, 2005 as "our offices in Dubai."

28.   Defendant Homay sent written payment instructions to its bank, the Commercial Bank of Dubai, on August 18, 2005.  Although Homay confirmed that the bank would be "debiting our account", they also advised that this substantial transfer of funds was being made "BY ORDER OF:  MAJDPOUR BROS."

29.   Upon information and belief, defendant Homay is simply a shell corporation dominated and used by the Majdpour Brothers to transact their business.  Although Homay's letterhead stationery states that Homay maintains a website at www.whitekitchen.com, there is in fact no such website.  Instead, that domain name is being offered for sale by www.buydomains.com.

30.   At least three of the defendant corporations conduct their business out of the same office.  Defendants Overseas Shipping Agencies, Majdpour Brothers Customs Clearance and Majdpour Brothers International Sea & Land Transport S.A. all operate out of an office on the 2nd floor of the Kafrang Building at No. 135, North Kheradmand Avenue in Tehran, Iran.  Upon information and belief, to the extent defendant Overseas Worldwide Holding Group operates as a going concern, it too operates out of the same office.

31.   Stock in the defendant companies is owned by the Majdpour Brothers. Specifically, Tawfiq Majdpour owns stock in defendants OAS, MBCC, MBISLT, GOL and MOS.  Majid Majdpour owns stock in defendants MBCC, MBISLT, GOGT and MOS.  Sina Majdpour owns stock in defendants OAS and GOL.  Naser Jaffar Majdpour owns stock in defendant GOGT.

32.   Upon information and belief, all of the stock in defendant OAS is owned by Tawfiq and Sina Majdpour.  All of the stock in defendants MBCC and MBISLT is

owned by Tawfiq Majdpour, Majid Majdpour and other Majdpour family members. All of the stock in defendant MOS is owned by Tawfiq, Sina, Majid and Naser Jaffar Majdpour.

33. Upon information and belief, the Majdpour Brothers control and dominate the activities and affairs of the defendants in their capacity as directors of said companies and otherwise. Specifically, Tawfiq and Sina Majdpour are the only directors of defendants OAS and GOL. Majid and Tawfiq Majdpour are the only directors of defendants MBCC, MBISLT and MOS. Finally, Majid and Naser Majdpour form a majority of the board of directors of defendant GOGT.

34. Upon information and belief, at all material times, there existed such unity of ownership and interest between Defendant OAS and the remaining defendants that no separation exists between them and the corporate form of all the defendants has been disregarded such that the Majdpour Brothers use the defendant companies interchangeably, without regard for their purported legal separateness, such that one company transacted the business of another and vice versa.

35. Upon information and belief, at all material times, the defendants have overlapping ownership, management, personnel and purposes such that the defendants do not operate at arm's length from each other but instead operate in concert and for their mutual benefit.

36. Upon information and belief, at all material times, the Majdpour Brothers have dominated, controlled and used the defendant corporations for their own purposes such that there is no meaningful difference between these entities.

37. Upon information and belief, at all material times, the Majdpour Brothers have disregarded the corporate form of the defendants to the extent that the defendants were treated as alter egos of one another without any regard for their alleged corporate separateness.

## BASIS FOR THE ATTACHMENT

38. Upon information and belief, and after investigation, Plaintiff has determined that the Defendants cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, but upon information and belief one or more of the Defendants has, or will have during the

pendency of this action, assets within this District comprising, *inter alia*, cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of the Defendants (hereinafter "Assets"), moving through garnishee banking institutions including but not limited to ABN Amro; American Express Bank; Bank of America NA; Bank of New York; Citibank; Deutsche Bank AG; HSBC Bank USA NA; JP Morgan Chase Bank; Standard Chartered Bank; Wachovia Bank and/or Mashreq Bank.

39. The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any assets of the Defendants or any of them held by or in the custody or temporary possession of the aforesaid garnishees for the purpose of obtaining personal jurisdiction over the Defendants and to secure Plaintiff's claims as described above.

WHEREFORE, Plaintiff prays:

a. That process in due form of law according to the usual practice of this Court may issue against Defendants citing them to appear and answer the foregoing, and failing such appearance and answer, to have judgment by default against the Defendants in the principal amount of the claim plus interest, costs and attorneys' fees;

b. That since Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching and restraining all Assets of Defendants in an amount up to and including the sum of $2,369,036.79, including but not limited to any cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or other assets of, belonging to, due or for the benefit of Defendants including, but not limited to such Assets as may be held, received or transferred in its own name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of the

aforesaid banking institutions including but not limited to ABN Amro; American Express Bank; Bank of America NA; Bank of New York; Citibank; Deutsche Bank AG; HSBC Bank USA NA; JP Morgan Chase Bank; Standard Chartered Bank; Wachovia Bank and/or Mashreq Bank and/or any other garnishee(s) upon whom a copy of the Process of Maritime Attachment and Garnishment issued in this action may be served;

c.    That an Order be entered directing Defendants to proceed to London arbitration for the adjudication of the merits of the claims;

d.    That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary in order to give effect to the aforesaid London arbitration; and

e.    For such other and further or different relief as this Court may deem just and proper in the premises.

Dated:    New York, NY
          June 25, 2007

                            BURKE & PARSONS
                            Attorneys for Plaintiff
                            HAWKNET LTD.

                            By    *Keith W. Heard*

                            Keith W. Heard (KH-8578)
                            100 Park Avenue
                            New York NY  10017-5533
                            (212) 354-3800

VERIFIED COMPLAINT                                    Page 9 of 10

## VERIFICATION

STATE OF NEW YORK        )

COUNTY OF NEW YORK    )

Keith W. Heard, being duly sworn, deposes and says:

1. I am a member of the bar of this Honorable Court and of the firm of Burke & Parsons, attorneys for the Plaintiff.

2. I have read the foregoing Amended Complaint and I believe the contents thereof are true.

3. This Verification has been made by deponent and not by Plaintiff because Plaintiff is a foreign corporation, and has no officers or directors within this jurisdiction.

4. The sources of my information and belief are documents provided to me and statements made to me by representatives of the Plaintiff.

_____

Keith W. Heard

Sworn to before me this
25ᵗʰ day of June, 2007

_____

Notary Public

**WILLIAM F. DOUGHERTY**
Notary Public, State of New York
No.02DO6121747, Qual. In Rockland County
Certificate Filed in New York County
Commission Expires January 24, 2009

9000_0010_amended complaint by hawknet ltd.doc

VERIFIED COMPLAINT

Page 10 of 10

# EXHIBIT A

Adopted by
the Documentary Committee of the General
Council of British Shipping, London
and the Documentary Committee of The Japan
Shipping Exchange, Inc., Tokyo

| 1. Shipbroker | RECOMMENDED<br>THE BALTIC AND INTERNATIONAL MARITIME CONFERENCE<br>UNIFORM GENERAL CHARTER (AS REVISED 1922 and 1976)<br>INCLUDING "F.I.O." ALTERNATIVE, ETC.<br>(To be used for trades for which no approved form is in force)<br>CODE NAME: "GENCON" | Part I |
|---|---|---|
| Rabet Shipping Co.<br>No 18 14th St<br>Pakistan St, Shakid Beheshty<br>Iran, Tehran | | |

| 2. Place and date |
|---|
| 15 June 05 , London |

| 3. Owners/Place of business (Cl. 1) | 4. Charterers/Place of business (Cl. 1) |
|---|---|
| Hawknet Ltd<br>27-37 St Georges Rd<br>Wimbledon, London<br>United Kingdom, SW19 4EU | Overseas Shipping Agencies<br>2nd floor no.135, N. Kheradmand Ave.<br>Tehran 15859<br>Iran |

| 5. Vessel's name (Cl. 1) | 6. GRT/NRT (Cl. 1) |
|---|---|
| 3 x Hawknet TBN tonnage | ---------- |

| 7. Deadweight cargo carrying capacity in tons (abt.) (Cl. 1) | 8. Present position (Cl. 1) |
|---|---|
| ---------- | ---------- |

| 9. Expected ready to load (abt.) (Cl. 1) |
|---|
| 1-§16 July 05 |

| 10. Loading port or place (Cl. 1) | 11. Discharging port or place (Cl. 1) |
|---|---|
| One good safe berth always afloat<br>always accessble charters berth -<br>Gdensk, Poland | One good safe berth always afloat/<br>accesble Bandar Imam Khomeini<br>(PSO berths) |

| 12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo") (Cl. 1) |
|---|
| Total 75,000mt of steel plates in 3 cargoes of 25,000mts plates, As per<br>api 5ix52 end api 5l x60 (ps112) specs received in London 1st June<br>June - 7.8/11.1mtrs July- 9.5/17.5mtrs August- 9.5/17.5mts<br>As full or part cargo owners option. |

| 13. Freight rate (also state if payable on delivered or intaken quantity) (Cl. 1) | 14. Freight payment (state currency and method of payment; also beneficiary<br>and bank account) (Cl. 4) |
|---|---|
| United States Dollars 55.25 per/mt | Freight 100pct fully paid within<br>10 banking days after signing B/L<br>marked freight payable as per C/P |

| 15. Loading and discharging costs (state alternative (a) or (b) of Cl. 5; also<br>indicate if vessel is gearless) | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b).<br>If total laytime for load. and disch., fill in c) only ) (Cl. 6) |
|---|---|
| Free in out stowed, lashed secured,<br>dunnaged. | a) Laytime for loading<br>Customary quick despatch |
| | b) Laytime for discharging<br>Customary quick despatch |

| 17. Shippers (state name and address) (Cl. 6) | c) Total laytime for loading and discharging |
|---|---|
| Overseas Shipping Agencies<br>2nd floor no135 NKheradmand Ave<br>Tehran 15859, Iran | ---------- |

| 18. Demurrage rate (loading and discharging) (Cl. 7) | 19. Cancelling date (Cl. 10) |
|---|---|
| detention for delays due to docs/cargo<br>readiness USD 30,000 both ends. | 1st shipment 15 july 2005 |

| 20. Brokerage commission and to whom payable (Cl. 14) |
|---|
| address commission 3.75pct to Overseas Shipping Agencies, 1.25pct to<br>Rabet Ship Co |

| 21. Additional clauses covering special provisions, if agreed. |
|---|
| Freight deemed earned on loading, discountless non-returnable, ship<br>and or cargo lost or not lost.Any taxes or dues on cargo and or freight<br>to be for charterers account. Any taxes/dues on vessel to be for owners<br>account. Any extra insurance on account vessels age/class/flag to be for<br>charterers account. English law and arbitration to apply in London.<br>Centrocon arbitration clause to apply. Owners agent at load port on<br>charterers agent at discharge port. Sub vessels acceptance by shippers<br>/receivers, shippers/receivers to give acceptance of nomination latest<br>8london working hours (9am/6pm) after the same not to be unreasonably<br>witheld.2nd/3rd laycens with 15 days spread within Aug/sept to be<br>mutually lateragreed |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include Part I as well as Part II.
In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | |

Printed and sold by Fr. G. Knudtzon Ltd., 55, Toldbodgade, Copenhagen, by authority of The Baltic and International Maritime Conference (BIMCO), Copenhagen.

PART II
"Gencon" Charter (As Revised 1922 and 1978)
including "F.I.O." Alternative, etc.

1. It is agreed between the party mentioned in Box 2 as Owners of the steamer or motor-vessel named in Box 1, of the gross/nett Register tons indicated in Box 6 and carrying about the number of tons of deadweight cargo stated in Box 7, now in position as stated in Box 8 and expected ready to load under this Charter about the date indicated in Box 9, and the party mentioned as Charterers in Box 4 that:

The said vessel shall proceed to the loading port or place stated in Box 10 or so near thereto as she may safely get and lie always afloat, and there load a full and complete cargo (if shipment of deck cargo agreed same to be at Charterers' risk) as stated in Box 12 (Charterers to provide all mats and/or wood for dunnage and any separations required by the Owners, Owners allowing the use of any dunnage wood on board if required) which the Charterers bind themselves to ship, and being so loaded the vessel shall proceed to the discharging port or place stated in Box 11 as ordered on signing Bills of Lading or so near thereto as she may safely get and lie always afloat and there deliver the cargo on being paid freight on delivered or intaken quantity as indicated in Box 13 at the rate stated in Box 13.

2. Owners' Responsibility Clause
Owners are to be responsible for the loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by the improper or negligent stowage of the goods (unless stowage performed by shippers/Charterers or their Stevedores or servants) or by personal want of due diligence on the part of the Owners or their Manager to make the vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied or by the personal act or default of the Owners or their Manager.

And the Owners are responsible for no loss or damage or delay arising from any other cause whatsoever, even from the neglect or default of the Captain or Crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this clause, be responsible, or from unseaworthiness of the vessel on loading or commencement of the voyage or at any time whatsoever.

Damage caused by contact with or leakage, smell or evaporation from other goods or by the inflammable or explosive nature or insufficient package of other goods not to be considered as caused by improper or negligent stowage, even if in fact so caused.

3. Deviation Clause
The vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and/or assist vessels in all situations, and also to deviate for the purpose of saving life and/or property.

4. Payment of Freight
The freight to be paid in the manner prescribed in Box 14 in cash without discount on delivery of the cargo at mean rate of exchange ruling on day or days of payment, the receivers of the cargo being bound to pay freight on account during delivery, if required by Captain or Owners.

Cash for vessel's ordinary disbursements at port of loading to be advanced by Charterers if required at highest current rate of exchange, subject to two per cent. to cover insurance and other expenses.

5. Loading/Discharging Costs
*(a) Gross Terms
The cargo to be brought alongside in such a manner as to enable vessel to take the goods with her own tackle. Charterers to procure and pay the necessary men on shore or on board the lighters to do the work there, vessel only having the cargo on board.

If the loading takes place by elevator, cargo to be put free in vessel's holds, Owners only paying trimming expenses.

Any pieces and/or packages of cargo over two tons weight, shall be loaded, stowed and discharged by Charterers at their risk and expense.

The cargo to be received by Merchants at their risk and expense alongside the vessel not beyond the reach of her tackle.

*(b) F.i.o. and free stowed/trimmed
The cargo shall be brought into the holds, loaded, stowed and/or trimmed and taken from the holds and discharged by the Charterers or their Agents, free of any risk, liability and expense whatsoever to the Owners.

The Owners shall provide winches, motive power and winchmen from the Crew if requested and permitted; if not, the Charterers shall provide and pay for winchmen from shore and/or cranes, if any. (This provision shall not apply if vessel is gearless and stated as such in Box 19).

* Indicate alternative (a) or (b), as agreed, in Box 16.

6. Laytime
*(a) Separate laytime for loading and discharging
The cargo also to be loaded within the number of running hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time actually used shall count.

The cargo shall be discharged within the number of running hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time actually used shall count.

*(b) Total laytime for loading and discharging
The cargo shall be loaded and discharged within the number of total running hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time actually used shall count.

*(c) Commencement of laytime (loading and discharging)
Laytime for loading and discharging shall commence at 1 p.m. if notice of readiness is given before noon, and at 6 a.m. next working day if notice given during office hours after noon. Notice at loading port to be given to the Shippers named in Box 17.

Time actually used before commencement of laytime shall count.
Time lost in waiting for berth to count as loading or discharging time, as the case may be.

* Indicate alternative (a) or (b) as agreed, in Box 16.

7. Demurrage
Ten running days on demurrage at the rate stated in Box 18 per day or pro rata for any part of a day, payable day by day, to be allowed Merchants altogether at ports of loading and discharging.

8. Lien Clause
Owners shall have a lien on the cargo for freight, dead-freight, demurrage and damages for detention. Charterers shall remain responsible for dead-freight and demurrage (including damages for detention), incurred at port of loading. Charterers shall also remain responsible for freight and demurrage (including damages for detention) incurred at port of discharge, but only to such extent as the Owners have been unable to obtain payment thereof by exercising the lien on the cargo.

9. Bills of Lading
The Captain to sign Bills of Lading at such rate of freight as presented without prejudice to this Charterparty, but should the freight by Bills of Lading amount to less than the total chartered freight the difference to be paid to the Captain in cash on signing Bills of Lading.

10. Cancelling Clause
Should the vessel not be ready to load (whether in berth or not) on or before the date indicated in Box 19, Charterers have the option of cancelling this contract, such option to be declared, if demanded, at least 48 hours before vessel's expected arrival at port of loading. Should the vessel be delayed on account of average or otherwise, Charterers to be informed as soon as possible, and if the vessel is delayed for more than 10 days after the day she is stated to be expected ready to load, Charterers have the option of cancelling this contract, unless a cancelling date has been agreed upon.

11. General Average
General average to be settled according to York-Antwerp Rules, 1974. Proprietors of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or default of the Owners' servants (see clause 2).

12. Indemnity
Indemnity for non-performance of this Charterparty, proved damages, not exceeding estimated amount of freight.

13. Agency
In every case the Owners shall appoint his own Broker or Agent both at the port of loading and the port of discharge.

14. Brokerage
A brokerage commission at the rate stated in Box 20 on the freight earned is due to the party mentioned in Box 20.
In case of non-execution at least 1/3 of the brokerage on the estimated amount of freight and dead-freight to be paid by the Owners to the Brokers as indemnity for the latter's expenses and work. In case of more voyages the amount of indemnity to be mutually agreed.

15. GENERAL STRIKE CLAUSE
Neither Charterers nor Owners shall be responsible for the consequences of any strikes or lock-outs preventing or delaying the fulfilment of any obligations under this contract.

If there is a strike or lock-out affecting the loading of the cargo, or any part of it, when vessel is ready to proceed from her last port or at any time during the voyage to the port or ports of loading or after her arrival there, Captain or Owners may ask Charterers to declare, that they agree to reckon the laydays as if there were no strike or lock-out. Unless Charterers have given such declaration in writing (by telegram, if necessary) within 24 hours, Owners shall have the option of cancelling this contract. If part cargo has already been loaded, Owners must proceed with same, (freight payable on loaded quantity only) having liberty to complete with other cargo on the way for their own account.

If there is a strike or lock-out affecting the discharge of the cargo on or after vessel's arrival at or off port of discharge and same has not been settled within 48 hours, Receivers shall have the option of keeping vessel waiting until such strike or lock-out is at an end against paying half demurrage after expiration of the time provided for discharging, or of ordering the vessel to a safe port where she can safely discharge without risk of being detained by strike or lock-out, such orders to be given within 48 hours after Captain or Owners have given notice to Charterers of the strike or lock-out affecting the discharge. On delivery of the cargo at such port, all conditions of this Charterparty and of the Bill of Lading shall apply and vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

16. War Risks ("Voywar 1950")
(1) In these clauses "War Risks" shall include any blockade of any port action which is announced as a blockade by any Government or by any belligerent or by any organized body, sabotage, piracy, and any actual or threatened war, hostilities, warlike operations, civil war, civil commotion, or revolution.

(2) If at any time before the Vessel commences loading, it appears that performance of the contract will subject the Vessel or her Master and his crew or her cargo to war risks at any stage of the adventure, the Owners shall be entitled by letter or telegram despatched to the Charterers, to cancel this Charter.

(3) The Master shall not be required to load cargo or to continue loading or to proceed on or to sign Bills of Lading for any adventure 189 on which or any port at which it appears that the Vessel, her Master and crew or her cargo will be subjected to war risks. In the event of the exercise by the Master of his right under this Clause after part of full cargo has been loaded, the Master shall be at liberty either to discharge such cargo at the loading port or to proceed therewith. In the latter case the Vessel shall have liberty to carry other cargo for Owners' benefit and accordingly to proceed to and load or discharge such other cargo at any other port or ports whatsoever, backwards or forwards, although in a contrary direction to or out of or beyond the ordinary route. In the event of the Master electing to proceed with part cargo under this Clause freight shall in any case be payable on the quantity delivered.

(4) If at the time the Master elects to proceed with part or full cargo under Clause 3, or after the Vessel has left the loading port, or the

PART II

"Gencon" Charter (As Revised 1922 and 1976)

Including "F.I.O." Alternative, etc.

last of the loading ports, if more than one, it appears that further 205
performance of the contract will subject the Vessel, her Master and 206
crew or her cargo, to war risks, the cargo shall be discharged, or if 207
the discharge has been commenced shall be completed, at any safe 208
port in vicinity of the port of discharge as may be ordered by the 209
Charterers. If no such orders shall be received from the Charterers 210
within 48 hours after the Owners have despatched a request by 211
telegram to the Charterers for the nomination of a substitute discharg- 212
ing port, the Owners shall be at liberty to discharge the cargo at 213
any safe port which they may, in their discretion, decide on and such 214
discharge shall be deemed to be due fulfilment of the contract of 215
affreightment. In the event of cargo being discharged at any such 216
other port, the Owners shall be entitled to freight as if the discharge 217
had been effected at the port or ports named in the Bill(s) of Lading 218
or to which the Vessel may have been ordered pursuant thereto. 219

(b) (a) The Vessel shall have liberty to comply with any directions 220
or recommendations as to loading, departure, arrival, routes, ports 221
of call, stoppages, destination, zones, waters, discharge, delivery or 222
any other wise whatsoever (including any direction or recom- 223
mendation not to go to the port of destination or to delay proceeding 224
thereto or to proceed to some other port) given by any Government or 225
by any belligerent or by any organized body engaged in civil war, 226
hostilities or warlike operations or by any person or body acting or 227
purporting to act as or with the authority of any Government or 228
belligerent or of any such organized body or by any committee or 229
person having under the terms of the war risks insurance on the 230
Vessel, the right to give any such directions or recommendations. If, 231
by reason of or in compliance with any such direction or recom- 232
mendation, anything is done or is not done, such shall not be deemed 233
a deviation. 234

(b) If, by reason of or in compliance with any such directions or re- 235
commendations, the Vessel does not proceed to the port or ports 236
named in the Bill(s) of Lading or to which she may have been 237
ordered pursuant thereto, the Vessel may proceed to any port as 238
directed or recommended or to any safe port which the Owners in 239
their discretion may decide on and there discharge the cargo. Such 240
discharge shall be deemed to be due fulfilment of the contract of 241
affreightment and the Owners shall be entitled to freight as if 242
discharge had been effected at the port or ports named in the Bill(s) 243
of Lading or to which the Vessel may have been ordered pursuant 244
thereto. 245

(c) All extra expenses (including insurance costs) involved in discharg- 246
ing cargo at the loading port or in reaching or discharging the cargo 247
at any port as provided in Clauses a and b (b) hereof shall be paid 248
by the Charterers and/or cargo owners, and the Owners shall have 249
a lien on the cargo for all moneys due under these Clauses. 250

17. GENERAL ICE CLAUSE 251
Port of loading 252

(a) In the event of the loading port being inaccessible by reason of 253
ice when vessel is ready to proceed from her last port or at any 254
time during the voyage or on vessel's arrival or in case frost sets in 255
after vessel's arrival, the Captain for fear of being frozen in is at 256
liberty to leave without cargo, and this Charter shall be null and 257
void. 258

(b) If during loading the Captain, for fear of vessel being frozen in, 259
deems it advisable to leave, he has liberty to do so with what cargo 260
he has on board and to proceed to any other port or ports with 261
option of completing cargo for Owners' benefit for any port or ports 262
including port of discharge. Any part cargo thus loaded under this 263
Charter to be forwarded to destination at vessel's expense but 264
against payment of freight, provided that no extra expenses be 265
thereby caused to the Receivers, freight being paid on quantity 266
delivered (in proportion if lumpsum), all other conditions as per 267
Charter. 268

(c) In case of more than one loading port, and if one or more of 269
the ports are closed by ice, the Captain or Owners to be at liberty 270
either to load the part cargo at the open port and fill up elsewhere 271
for their own account as under section (b) or to declare the Charter 272
null and void unless Charterers agree to load full cargo at the open 273
port. 274

(d) This Ice Clause not to apply in the Spring. 275

Port of discharge 276

(a) Should ice (except in the Spring) prevent vessel from reaching 277
port of discharge Receivers shall have the option of keeping vessel 278
waiting until the re-opening of navigation and paying demurrage, or 279
of ordering the vessel to a safe and immediately accessible port 280
where she can safely discharge without risk of detention by ice. 281
Such orders to be given within 48 hours after Captain or Owners 282
have given notice to Charterers of the impossibility of reaching port 283
of destination. 284

(b) If during discharging the Captain for fear of vessel being frozen 285
in deems it advisable to leave, he has liberty to do so with what 286
cargo he has on board and to proceed to the nearest accessible 287
port where she can safely discharge. 288

(c) On delivery of the cargo at such port, all conditions of the Bill 289
of Lading shall apply and vessel shall receive the same freight as 290
if she had discharged at the original port of destination, except that if 291
the distance of the substituted port exceeds 100 nautical miles, the 292
freight on the cargo delivered at the substituted port to be increased 293
in proportion. 294

## Additional clauses to Overseas / Hawknet
## charter party dated 15th June 2005

18.    Deleted

19.    Deleted

20.    Deleted

21.    On arrival at load port vessel's holds will be thoroughly swept / washed / cleaned and in all respect ready to load to the satisfaction of shippers and/or surveyors.

22.    Full freight deemed earned upon cargo being loaded onboard, discountless and non-returnable whether cargo/vessel lost or not lost.

100 pct freight to be paid less 3.75 pct address commission by way of telegraphic transfer into owners' nominated bank account within 10 days after completion of loading and signing / releasing "Clean on Board" bills of lading marked "Freight payable as charter party dated 15th June 2005. In case of any remarks on mate's receipts, owners to sign and release "clean on board" bills of lading against charterers issuing LOI as per owner P & I club wording which to be signed by charterers only.

Freight payable to :
Barclays Bank Plc
P.O.Box 850, Barclays House
Alexandra Road, Wimbledon
London SW19 7LA
United Kingdom
Sort Code: 20 96 89
USD Account No: GB98 BARC 2071 0248 4121 22
Swift No: BARC GB22
Favour: Hawknet Limited

Freight inclusive of all extra War Risk Insurance / Crew War bonus / Crew War Risk Insurance/ Blocking and Trapping  i.e.  all for owners account.

23.    Deleted

24.    **Vessels Description** (1st Shipment)
M/V "MASTRO GIORGIS II"
CRANED SELFTRIMMING B/C
BUILT 1995 - CYPRUS FLAG
52,370 MTS DWAT ON 12.33 MTRS
TPI 145.8 MT - CLASS: LRS
2,124,614 CBFT GRAIN IN HOLDS
LOA: 216.00 M - BEAM: 31,80 M
8/8 HO/HA
HATCH DIMS: NO 1 : 12.8 X 13.6 - NO 2 TO NO 8 : 12.8 X 17.00 MTRS
HATCH COVERS: SIDE FOLDING TYPE EXCEPT NO 1 (FORE FOLDING)
CRANES : 4 X 30 TS

4

## Additional clauses to Overseas / Hawknet
## charter party dated 15th June 2005

CO2 FITTED
GRT/NRT : 31643/17595
AUSSIE LADDERS FITTED
STRENGTHENED FOR HEAVY CARGOES - NR 1,3,4,6 AND 8 HOLDS MAY BE
EMPTY SUB CARGO DEADWEIGHT/STOWAGE FACTOR AND BUNKERS ON
BOARD
HOLDS GRAIN CAPACITY BREADOWN (NR 1 TO 8):
246153-263813-249331-290651-230967-275818-272286-295595 CBFT

All details about

25.    Deleted

26.    All opening and closing of hatches including removal of beams to be for
       Owners' time, risk and expense at both ends.

27. \  Valid Certificate Clauses : Vessel is to be in possession of all necessary
       valid certificates in all ports of call. In case of any delay to the vessel
       caused by failure to produce any valid needed certificate at all ports of
       call, all time/expenses to be for owners account.

28.    Charterers and their supercargo have the right of using the ship's wireless
       station including VHF when permitted. Charterers paying the cost incurred.

29.    In case of loss of time due to boycotting of the vessel by labourers or by
       any authority, Union etc., time not to count as laytime provided boycott is
       direct consequence of contravention by Owners of any valid agreement by
       Owners.

30.    Deleted

31.    Bills of lading clause
       If requested by Charterers, Owners to utilize Owners or Gencon form
       Bill(s) of Lading, and same to be signed by Master or Owners' agents and
       always on behalf and release same immediately on completion of loading
       to Shippers unless otherwise instructed by Charterers.

32.    Gear Test Clause
       Owners guarantee that the vessel is and will be maintained tight, strong
       and in every way fitted for voyage. Winches to have at all times, sufficient
       power and derricks/cranes to be always in working condition. In the event
       of breakdown of vessel's cranes/derricks and/or failure of winches,
       anytime lost in loading and/or discharging and any other directly related
       costs for the above reasons to be for Owners' account. If such breakdown
       and/or failure is not repaired by ship's engineers within twelve hours then
       Charterers are allowed to hire shore cranes at Owners' expense.

33.    Owners guarantee vessel's holds/tanktops are free of rust/loose scale/

## Additional clauses to Overseas / Hawknet
## charter party dated 15th June 2005

padeyes.

34.   Owners guarantee that the vessel is not balck listed in the Arab League and there is no interest of any Israeli controlled party in the vessel.

35.   Deleted

36.   Deleted

37.   Vessel to be left in seaworthy trim to Master's reasonable satisfaction between all berths/ports.

38.   Deleted

39.   Deleted

40.   <u>Survey clause</u>
      Charterers to have the option of conducting a survey at first loading port using an Independent Surveyor in order to verify the working condition of vessel's gear, operation and water-tightness of the hatch covers and ventilation. Such survey to be carried our prior to loading under this charter party. Should any defect be revealed the same to be rectified by Owners to the satisfaction of the Surveyor at Owners time and cost. In such case survey expenses to be for Owners' account. If no defect revealed then time/cost of survey to be for Charterers account.

      Owners guarantee all certificates of the vessel to be valid during entire charter party period, Owners guarantee that the vessel's holds/tanktops are free of rust/loose scales/padeyes.

41.   Owners guarantee that MV."Mastro Giorgis II" is fully suitable/workable for shipmen of 25000 mt steel plates and Owners to be fully responsible for safe delivery of cargo, otherwise all time, cost/expenses in this respect to be for Owners' account.

42.   <u>Hose Testing Clause</u>
      Shippers have the right for hose testing which will be performed by Independent Surveyors who will be appointed by them :- if test negative (i.e. no leakage) then time and expenses to be for charterers' account. If test positive (i.e leakage) then time and expenses to be for Owners' account and time not to count until vessel passes above mentioned survey.

43.   <u>Cotecna Clause or International surveyor</u>
      Deleted

44.   <u>ITF Clause</u>
      The owners of the vessel guarantee that the minimum terms and conditions of employment of the crew of the vessel are now, or will be

6

### Additional clauses to Overseas / Hawknet charter party dated 15th June 2005

prior to presentation of the vessel for loading, and will remain for period of this charter party, covered by an ITF agreement or a bona fide Trade Union Agreement acceptable to the ITF. If berthing, loading or discharging of the vessel is prevented or delayed by or as a consequence of, any industrial dispute arising directly or indirectly from the terms and conditions of employment of the crew, any time lost by reason thereof shall not count during the continuance of such prevention or delay and the Owners shall reimburse the Charterers and/or shippers for any expense whatsoever caused thereby.

45.    Owners are not permitted to change vessel's name / flag / ownership / banking address and beneficiary which declared in final recap of fixture, at all.

46.    Deleted

47.    Deleted

48.    Deleted

49.    Lighting Clause
       Deleted

50.    Deleted

51.    Deleted

52.    Deleted

53.    Short Delivery Certificate
       Deleted

54.    Arbitration clause
       Any dispute arising under the charter to be referred to arbitration in London and English law to apply. One arbitrator to be nominated by the Owners and the other by the Charterers and in case the arbitrators shall not agree, the decision of any umpire to be appointed by them (By the arbitrator so appointed) to be binding. The award of the arbitrators or the umpire to be final and binding both parties. Centrocon arbitration clause to apply as well.

55.    Tally clause
       Deleted

56.    Deleted

57.    Set off clause
       Deleted

7

## Additional clauses to Overseas / Hawknet
## charter party dated 15th June 2005

58.    Deleted

59.    Owners agents at load port,  Gdansk

**B and K Agency**
Armii Krajowej 68/4 - 81-844
Sopot
Poland

Phone : 00 485 8551 0812
Fax    : 0048585514801
Telex : 06354662
MobilePhone: 0048602226609 Rafel Meissner
Internet: bplusk.agency@gdansk.sprint.pl

At discharge port, charterers agent at comptetive / customary market terms.

60.    Letter of Indemnity Clause :
In case original Bill(s) of Lading unavailable at discharge port Owners agree to discharge entire cargo against production of letter of indemnity as per wording by Owners' Protection and Indemnity Club signed by charterers / receivers only.

61.    Force Majeure Clause :
Deleted

62.    Deleted

### Additional clauses to Overseas / Hawknet charter party dated 15th June 2005

#### I. Both to blame collision clause

If the liability for any collision in which the vessel is involved while performing this charter party falls to be determined in accordance with the laws of the United states of America, the following clause shall apply :-

#### Both to blame collision clause

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non carrying ship or her Owners in so far as such loss or liability represents loss or damage to or any claim whatsoever of the Owners of said goods, paid or payable by the other or non carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other non carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The forgoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

And the Charterers shall procure that all Bills of Lading issued under this charter Party shall contain the same clause.

#### II. General Average and the New Jason Clause

General Average shall be payable according to the York/Antwerp Rules, 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:-

#### New Jason Clause

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statue, contract or otherwise, the goods, shippers, consignee or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier , salvage shall be paid for as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required be made by the goods shippers, consignee or owners of the goods to the carrier before delivery. "

And the charterers shall procure that all bills of lading issued under this charter party shall contain the same clause.

9