Keith W. Heard (KH-8578)
Burke & Parsons
100 Park Avenue
New York NY 10017-5533
(212) 354-3800

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **HAWKNET LTD.**, <br><br>                                  **Plaintiff,** <br><br> -against- <br><br> **OVERSEAS SHIPPING AGENCIES; OVERSEAS WORLDWIDE HOLDING GROUP; HOMAY GENERAL TRADING CO. LLC; MAJDPOUR BROS CUSTOMS CLEARANCE, MAJDPOUR BROS INTERNATIONAL SEA & LAND TRANSPORT S.A.; GULF OVERSEAS LLC; GULF OVERSEAS GENERAL TRADING LLC and MOS OVERSEAS SHIPPING VERMITTLUNG GMBH,** <br><br>                                  **Defendants.** | **MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO VACATE ATTACHMENT AND IN SUPPORT OF CROSS-MOTION TO AMEND** <br><br> **07 CV 5912 (NRB)** <br><br> **Electronically Filed** |

Plaintiff Hawknet Ltd. submits this memorandum of law in opposition to the motion by TOM Shipping Vermittlung GmbH to vacate an attachment of funds at the Bank of New York Mellon ("BONY Mellon") and in support of Hawknet's cross-motion for leave to file a Second Amended Verified Complaint.

**Factual Background**

On June 15, 2005, Hawknet, as disponent owner, agreed to charter three vessels, the names of which were to be nominated, to defendant Overseas Shipping Agencies ("OSA"), as charterer, for the carriage of three cargoes of steel plate from Gdansk,

Poland to Bandar Imam Khomeini, Iran. A copy of the contract, which contains a London arbitration clause, is annexed as Exhibit A to the Amended Verified Complaint. Hardison declaration, Exh. 1. OSA performed one voyage under the contract and then defaulted by failing to perform the remaining two voyages. Although legally inexcusable, the reason for OSA's default was clear: the market rate for similar vessels had dropped sharply below what OSA had agreed to pay Hawknet under the terms of their contract. OSA proceeded to arrange other vessels to transport its remaining two steel cargoes, saving money as against the agreed contract rate but creating a very large breach of contract claim in favor of Hawknet. See Cook declaration, ¶ 6; Amended Verified Complaint, ¶¶ 15–17.

Irregularities had occurred during performance of the one voyage that OSA actually made under the contract. OSA owed Hawknet freight for the cargo shipped on the performing vessel in the amount of $1,362,199.15. However, that amount was not paid by OSA but, pursuant to instructions from Sina Majdpour[1], was paid instead by defendant Homay, which Mr. Majdpour described to Hawknet in an email dated August 20, 2005 as "our offices in Dubai." Amended Complaint, ¶ 27.

Defendant Homay sent written payment instructions to its bank, the Commercial Bank of Dubai, on August 18, 2005. Although Homay confirmed that the bank would be "debiting our account", they also advised that this substantial transfer of funds was being made "BY ORDER OF: MAJDPOUR BROS." Amended Complaint, ¶ 28.

---

[1] In the report prepared by Gray Page Intelligence Services Limited (Heard decl., Exh. B, page 6), Sina Majdpour is identified as the General Manager of OSA. He is also a shareholder and director of defendant MOS Overseas Shipping Vermittlung GmbH ("MOS Overseas"), based in Hamburg, Germany. The other shareholders in MOS Overseas are Tofigh, Majid and Naser Majdpour. Rahimzadeh decl., Exh. 8.

Upon investigation after OSA breached the contract, Hawknet learned that OSA is just one of a number of companies dominated and controlled by Sina Majdpour and his brothers, including MOS Overseas. Information on the Majdpour group is set forth in paragraphs 29 through 37 of the Amended Complaint and in the Gray Page report, which has been submitted as Exhibit B to the Heard declaration. In general, the companies in the group have common shareholders and directors and little respect is shown for the corporate separateness of the various companies in the group. As will be seen, what happened in connection with the attachment in this case may be the best example of that.

Given the difficulties of enforcing a London arbitration award in Iran, Hawknet's F D & D underwriter (which covers the legal fees in charter party disputes) declined to support formal proceedings against OSA and the other Majdpour companies until last summer when there were indications that OSA had resumed chartering ships and the possibility of obtaining a Rule B attachment of a freight payment by OSA (or another company in the group) presented itself. Hawknet then filed this action and began serving Process of Maritime Attachment and Garnishment on various banks in the Southern District of New York.

Prior to the attachment that is currently before the Court, Hawknet had just a few modest successes with its attachment action. On September 12, 2007, an attachment was effected against funds of MOS Overseas in the amount of $3,780 at HSBC Bank in New York and notice of the attachment was faxed to MOS Overseas on September 13, 2007, pursuant to Local Admiralty Rule B.2. See Heard decl., ¶ 6 and Exh. C. On January 7, 2008, an attachment was effected in this action against funds of MOS Overseas in the

amount of $22,394.12 at the BONY Mellon and the required notice of the attachment was faxed to MOS Overseas that same day.  See Heard decl., ¶ 7 and Exh. E.

Although the amount of these attachments was rather small, it appears their effect was to prompt MOS Overseas into taking evasive action.  On September 13, 2007, one day after the attachment at HSBC Bank, Mr. Asadollah Rahimzadeh, the chartering manager at MOS Overseas, set up TOM Shipping with two Iranian women, Ms. Rasa Soufi Amlashi and Ms. Akram Alizadeh Matanagh[2].  Bimschas decl., ¶ 9.  After the attachment of funds belonging to MOS Overseas occurred at BONY Mellon in January of this year, Mr. Rahimzadeh set up a banking account for TOM Shipping at Hamburger Sparkasse Bank ("HSB") in Hamburg. . Rahimzadeh decl., ¶ 9.

Surprisingly, although she is both a shareholder in and director of TOM Shipping, Ms. Amlashi is only 22 years old.  Rahimzadeh decl., Exh. 8.  In addition, it appears quite clear that she and Ms. Matanagh are members of the Majdpour family.  The address given for them in TOM Shipping's articles of association (Rahimzadeh decl., Exh. 1) -- which is Harvestehuder Weg 79, Hamburg 20149 -- is what appears to be a luxury apartment house.  There are five nameplates by the front door but none of them bear the names "Amlashi" or "Matanagh".  However, one of the plates does say "Majdpour".  Bimschas decl., ¶ 9 and Exhs. H, I, J and K.

Getting back to TOM Shipping's commercial affairs, the statement for the company's bank account at HSB shows there was essentially no activity in the account until March 17th, when €1,600,000 (U. Hussain S. $2,517,120 at today's exchange rate)

---

[2]  Page 2 of the Gray Page report indicates that Hussain Mohammed Ali Zadeh Matanagh is a shareholder in Gulf Overseas General Trading LLC, one of the defendants in this action and a principal defendant in a similar Rule B action filed by Deiulemar Compagnia di Navigazione last year.  See Heard decl., Exhs. A and B.

- 4 -

was transferred into it. Mr. Rahimzadeh then gave instructions for the bank to remit the funds – not as Euros, but as U.S. dollars – to the account of Brooklands Planning Pte. Ltd. in Singapore. When HSB initiated the transfer, it showed the originator as "TOM SHIPPING VERMITTLUNG GMBH c/o MOS OVERSEAS SHIPPING VER, NEUER WALL 8, 20354 HAMBURG." Rahimzadeh decl., Exh. 6. (This is not surprising since a German business website shows TOM Shipping as having an address of Neuer Wall 8, 20354 Hamburg, the same as that of MOS Overseas. Heard decl., Exh. G.) In any event, when the funds reached BONY Mellon, the presence of the name "MOS Overseas" on the transfer triggered the attachment and the bank detained the funds.

The address stated for TOM Shipping in the wire transfer instructions that Mr. Rahimzadeh gave to HSB on March 17, 2008 was as follows:

> TOM Shipping Vermittlung GmbH
> Forsterweg 22    C/o Rahimzadeh
> 22585  Hamburg

However, that is not the address of a business or commercial building. Rather, it is simply an apartment house and it appears to be where Mr. Rahimzadeh lives See Bimschas decl., para. 7, Exhs. D and E. The only commercial address that TOM Shipping would appear to have is "c/o MOS Overseas" at Neuer Wall 9 in Hamburg.

According to TOM Shipping, the money that was attached was being sent to Brooklands to pay freight charges on a voyage charter of the M/V JOUDI dated February 8, 2008. Exhibit 2 to the Rahimzadeh declaration is a copy of what is known as the "fixture recap" for the contract, which was agreed for JOUDI to carry a cargo from Selaata, Lebanon to Bandar Abbas, Iran. The fixture recap is quite revealing. It shows, for example, that a Mr. George Lemos of Sea Challenger Maritime Limited in London

was the broker on the fixture. As shown in the Cook declaration (¶ 6) and the Gray Page report (pages 5 and 7), Mr. Lemos and his company have close links to MOS Overseas and the Majdpour brothers. When Gray Page asked him about this fixture, he refused to comment. Heard decl, Exh. B, page 5. Hawknet has requested a copy of the correspondence between Mr. Lemos/Sea Challenger and his principal in connection with the fixture of the JOUDI but TOM Shipping has refused to provide that material. Heard decl., ¶ 9 and Exhs. H and I.

The fixture recap also shows that the local agent TOM Shipping designated to attend to the vessel's needs at Bandar Abbas was none other than OSA, which Gray Page has described as the lead company in the Majdpour group. Heard decl., Exh. B, page 3. Mr. Cook of Hawknet has confirmed that OSA actually served as TOM Shipping's agent for the vessel's call at Bandar Abbas last month. Cook decl., ¶ 5.

Gray Page have further determined that OSA actually played a far more significant role in connection with the M/V JOUDI. According to their report, OSA purchased and was importing into Iran the cargo on the vessel. Heard decl., Exh. B, pages 6 and 8. Obviously, OSA needed a vessel to do this. However, the New York attachment actions being maintained by Hawknet and Deiulemar prevented MOS Overseas or any of the other defendants in those two actions from sending U.S. dollar denominated transfers through the banking system in New York. It does not take much imagination to conclude that OSA, MOS Overseas and the Majdpours used TOM Shipping for that purpose. Non-attachable Euros were sent to TOM Shipping's German bank account and TOM was then to transfer U.S. dollars to Brooklands, the JOUDI's time-chartered owner. However, the plan went awry when HSB, relying on its own

address records for the account, put "TOM SHIPPING c/o MOS OVERSEAS" on the wire transfer document. Rahimzadeh decl., Exh. 7.

The alter ego relationship between the defendants and TOM Shipping has also manifested itself in the Majdpour brothers' purchase of two vessels, the TOM SHIP 1 and the TOM SHIP 2. Clearly, the names of these vessels would indicate that they are owned by TOM Shipping. However, Gray Page have determined that "the ultimate owners of the *Tom Ship 1* are considered to be Overseas Shipping Agencies (OSA)." Heard decl., Exh. B, page 7. They further conclude that "given the obvious name connection between these two vessels and TOM, we believe that the Majdpour brothers are clearly linked to the Hamburg operation." *Id*. at p. 8. Finally, Gray Page write as follows:

> These vessels [TOM SHIP 1 and TOM SHIP 2] are being operated through the same London broker as is quoting TOM cargoes. This broker has also been formerly associated with quoting cargoes for both GOGT and MOS for many years.

*Id*. at p. 9. (GOGT is the Majdpour company that chartered a ship from Deiulemar that underlies the action pending before Judge Batts. See Heard decl., Exh. A.)

At least one of the vessels, the TOM SHIP 1, is entered for marine protection and indemnity risks ("P&I") with the Steamship Mutual Underwriting Association (Bermuda). Heard decl., Exh. J. Interestingly, the money Hawknet attached in January was being sent by MOS Overseas to Steamship Mutual. Heard decl., Exh. D. It is not likely that this is a coincidence. Instead, Hawknet contends it is further evidence that MOS Overseas and the Majdpour family are now conducting their business through their new alter ego, TOM Shipping. Accordingly, Hawknet submits that the attachment should remain in place and that it should be granted leave to file a Second Amended Complaint, naming TOM Shipping as a defendant in this action.

## POINT I

### PLAINTIFF HAS SATISFIED THE
### REQUIREMENTS OF RULE B AND
### THE ATTACHMENT SHOULD BE UPHELD.

To sustain an attachment, plaintiff must show that it has fulfilled the "filing and service requirements of Rules B and E" and that: "1) it has a valid *prima facie* admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment." *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 (2nd Cir. 2006).

In admiralty disputes involving alter ego issues, Federal courts apply federal common law when analyzing corporate identity. *World Reach Shipping Ltd. v. Industrial Carriers Inc.*, No. 06 Civ. 3756, 2006 WL 3316828, * 3 (S.D.N.Y. Nov. 9, 2006). The Second Circuit has set forth the following test for piercing the corporate veil in a maritime claim:

> [t]he test for piercing the corporate veil in a maritime context was enunciated in *Kirno Hill Corp. v. Holt,* 618 F.2d 982, 985 (2d Cir. 1980). The individual must have used the corporate entity to "perpetrate a fraud or have so dominated and disregarded" the corporate entity's form that the entity "primarily transacted [the individual's] personal business rather than its own corporate business." *Id.*

*Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 342 (2d Cir. 1986).

"When assessing whether a plaintiff has adequately plead an alter ego theory of liability, courts consider a number of factors, including whether the plaintiff has alleged that the alter ego intermingled funds; overlapped in ownership, officers, directors and personnel; shared common office space, addresses and telephone numbers; and/or whether payments or guarantees of one corporation's debts have been held or paid by the

other.  *Fesco Ocean Mangement Ltd. v. High Seas Shipping Ltd.*, No. 06-cv-01055, 2007 U.S. Dist. LEXIS 19970, *9-10 (S.D.N.Y. March 12, 2007), citing *MAG Portfolio Consultant, GmbH v. Merlin Biomed Broup LLC*, 628 F. 3d 58, 63 (2d Cir. 2001).

As this Court noted in *Fesco,* after the Second Circuit's decision in *Aqua Stoli*, "[t]here has been some disagreement in the Second Circuit regarding the standard that district courts should apply when deciding whether to vacate a maritime attachment challenged at a Supplemental Rule E(4)(f) hearing*.*" 2007 U.S. Dist. LEXIS 19970 at *8.³  Without firmly deciding the issue, this Court has noted on two occasions that "after *Aqua Stoli*, it appears that courts should simply consider whether a plaintiff seeking to maintain a maritime attachment has pled a prima facie case justifying that attachment under *Rule B.*"  *Id.*  *See also World Reach Shipping, supra* at *3 ("*Aqua Stoli* strongly suggests that the *Ullises* standard [of reasonable grounds] is no longer good law on this point").

Regardless of the standard to be applied at a Rule E(4)(f) post-attachment hearing, the factual allegations needed to sustain a Rule B attachment must be pled with a fair degree of particularity.  As stated by the Court in *Tide Line*:

> Rule E(2)(a) of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Supplemental Rule E(2)(a)"), however, requires that, in an action *in personam* with process of maritime attachment and garnishment, a complaint "state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading."  Fed. R. Civ. P. Supp. R. E(2)(a).  "This standard for the particularity of complaints is more stringent than the pleading requirements of the Federal

---

³ As evidence of this split of authority, this Court compared the pre-*Aqua Stoli* "reasonable grounds" test for sustaining an attachment, as articulated by *Ullises Shipping Corp. v. FAL Shipping Co. Ltd.*, 415 F. Supp. 2d 318 (S.D.N.Y. 2006), with the post-*Aqua Stoli* "prima facie test" articulated in *Tide Line, Inc. v. Eastrade Commodities, Inc.,* 2006 WL 4459297, 2007 A.M.C. 252, 255 (S.D.N.Y. Aug 15, 2006).

Rules of Civil Procedure." *U.S. v. Premises and Real Property at 4492 South Livonia Road, Livonia, N.Y.,* 889 F.2d 1258, 1266 (2 Cir. 1989) 2007.

A.M.C. at 261-62

Nevertheless, maritime claimants are not required to prove their case at a Rule E(4)(f) hearing to prove their case. *T & O Shipping Ltd. v. Source Link Co., Ltd.*, No. 06-CV-7724, 2006 WL 3513638, *2 (S.D.N.Y. Dec. 5, 2006). This is particularly the case where plaintiff alleging an alter ego claim has not yet had opportunity to conduct discovery. *Wajilam Exps (Sing.) Pte. Ltd. v. ATL Shipping, Ltd.*, No. 05 Civ. 7955, 2006 WL 3019558, at *3 (S.D.N.Y. Oct. 23, 2006); *Japan Line, Ltd. v. Willco Oil Ltd.* 434 F. Supp. 1092, 1094 (D. Conn. 1976). In fact, in this case, plaintiff's urgent request for documents related to the chartering of the M/V JOUDI and the transfer of funds into TOM Shipping's account has been rebuffed. See Heard decl., ¶¶ 9 and 10, Exhs. H and I.

All that is required at the Rule E(4)(f) hearing is that plaintiff demonstrate it has pled enough factual allegations of sufficient particularity to show the Court that plaintiff has a *prima facie* claim. As Judge Wood wrote in *Tide Line,* "the Court should not engage in a broad inquiry into evidence presented as to [defendant] Transclear's relationship with [defendant] Eastrade Inc. Rather, the Court must focus on the narrower question of whether [plaintiff] Tide Line has shown that it has a valid *prima facie* claim against Transclear on the basis of alleged alter ego status." 2007 A.M.C. at 267. Likewise, this Court in *World Reach Shipping* stressed that it is not the Court's role to determine "the ultimate merits of the claims [against the corporate veil defendant], which are more properly the subject of the arbitration." 2006 WL 3316828 at *2.

**POINT II**

**THE CASES CITED BY TOM
SHIPPING ARE DISTINGUISHABLE
AND DO NOT WARRANT THE REQUESTED
VACATUR OF THE ATTACHMENT.**

TOM Shipping's reliance on *T & O Shipping, Ltd. v. Source Link Co., Ltd.*, No. 06-CV-7224, 2006 WL 3513638 (S.D.N.Y. Dec. 5, 2006), is misplaced. In *T & O Shipping,* plaintiff filed a Rule B attachment action against defendant Source Link Co., Ltd. and attached funds of a non-party named Source Link Shipping Co. The non-party was in existence when the Complaint was filed and its existence was known to plaintiff's attorneys, who had named the non-party as a co-defendant in another action against Source Link Co., Ltd. The Court agreed with the non-party that "the Attachment should be vacated, because Source Link Shipping was not named in the Verified Complaint or in the Attachment." *Id*. at *4.

The Court based its decision on the following two grounds:  (1) that "Plaintiffs [sic] failed to provide Source Link Shipping with actual notice that T & O claimed an interest in Source Link Shipping's property, because the Complaint failed to name Source Link Shipping as a defendant", *id*. at *5; and (2) that plaintiff had exceeded the scope of the attachment, which only named Source Link Co., Ltd., *id*. at *6. However, the Court was especially concerned that "Plaintiff's counsel was aware that when suing Source Link, it was prudent to include Source Link Shipping." *Id*. at *6. The Court concluded as follows:

> These facts tilt the balance of the equities in Defendant's favor, because the decision not to name Source Link Shipping in the Verified Complaint and Attachment *cannot be attributed to the actions of Defendant*. See *Greenwich Marine, Inc. v. S.S. Alexandra,* 339 F.2d 901, 905 (2d

> Cir.1965) ("The inherent power to adapt an admiralty rule to the equities of a particular situation is entrusted to the sound discretion of the district judge sitting as an admiralty judge...."). [Emphasis added.]

*Id*.

By contrast with the facts in *T & O Shipping,* Hawknet contends that defendant MOS Overseas *itself* was instrumental in establishing TOM Shipping as a subterfuge to avoid the liabilities of MOS Overseas (and/or other defendants in the Majdpour group). Whereas the existence of Source Link Shipping Co. as a potential alter ego entity was known to plaintiff's attorneys at the time T & O filed its complaint, no such conclusion can be reached here. Indeed, the facts in this case show that the defendants in the Majdpour group only formed TOM Shipping *after* Hawknet filed its attachment action and demonstrate further that the Majdpour group did not begin using the bank account of TOM Shipping as a payment vehicle for transactions involving MOS Overseas until after Hawknet had achieved partial security through prior attachments.

The importance of the foregoing distinction was implicitly recognized by the *T & O Shipping* Court itself. The plaintiff in *T & O Shipping* had relied on *Tide Line, Inc. v. Eastrade Commodities, Inc.,* 2007 A.M.C. 252 (S.D.N.Y. 2006), a case in which Judge Wood vacated an attachment, but stayed release of the funds and allowed plaintiff to file an amended complaint that would then support the attachment. Analyzing Judge Wood's decision, the *T & O Shipping* Court noted that "[c]ritically, the court noted that Tide Line made this application *on the basis of 'new information discovered since the filing of the Complaint.'" T & O Shipping, supra* at *6 (emphasis added).

That situation mirrors what has happened here, where plaintiff could not have possibly included TOM Shipping as a defendant when this action was filed because the

company did not exist. The *T & O Shipping* Court concluded that it could not follow *Tide Line* for the following reasons:

> *Tide Line* is distinguishable on a few important grounds. First, Tide Line actually named Transclear as a defendant in the complaint, and obtained an attachment based on that complaint, something that did not happen here. Source Link Shipping was not named in the Complaint, no allegations were made against it, and the Attachment signed by this Court did not include Source Link Shipping. Second, the *Tide Line* Court allowed the plaintiff to amend the complaint on the basis of *newly discovered evidence that supported piercing the corporate veil*. T & O's counsel, unlike counsel in *Tide Line,* has suspected for at least two years that Source Link Shipping is the alter ego of Source Link. [Emphasis added.]

*Id*. at \*7.

There is yet a further distinction between the facts in *T & O Shipping* and those here. The electronic funds transfer attached in *T & O Shipping* was solely in the name of Source Link Shipping, Inc., not Source Link. *T & O Shipping, supra* at *1. In this case, however, the electronic funds transfer attached at Bank of New York Mellon was in the name of "TOM Shipping c/o MOS Overseas," thereby demonstrating a relationship between those two parties on the remittance document itself.

The foregoing distinctions demonstrate that the instant case is more like *Tide Line* than *T & O Shipping.* TOM Shipping was not named in the Amended Complaint in this action because it could not have been. Indeed, the existence of TOM Shipping and its *alter eg*o relationship with defendant MOS Overseas (and possibly other defendants as well) has only come to light, as far as plaintiff is aware, in recent weeks.

TOM Shipping's reliance on *DS Bulk Pte. Ltd. v. Calder Seacarrier Corp.*, No. 05 Civ. 10146, 2006 WL 1643110 (S.D.N.Y. June 13, 2006), is equally misplaced. In that case, plaintiff attached funds of Universal, a non-party, on the basis that the money in

Universal's account actually belonged to the defendant Calder.  The Court wrote as follows:

> DS Bulk maintains that the attachment is valid . . . because the $56,042.20 attached were not Universal's own funds, but rather belonged to Calder-- the named defendant--and were merely passing through Universal's bank account at the time they were attached.  Therefore, DS Bulk reasons, "it is not necessary to name UCL as a defendant any more than it is necessary to name the bank holding the EFT as a defendant."  However, DS Bulk cites no authority for the proposition that property of a non-party to an action may be attached on the bare assertion that this property in fact belongs to a party to the action.

*Id*. at *2.  *Compare*, *Essar Int'l Ltd. v. Martrade Gulf Logistics, FZCO,* 2007 A.M.C. 2017 (S.D.N.Y. 2007), where an attachment of funds of a non-party being transferred for the defendant's benefit was upheld.

The instant action differs from *DS Bulk* in two significant respects.  First, plaintiff Hawknet has strong, credible evidence that the alleged non-party in this action is no more than an alter ego for one or more of the defendants herein.  Second, Hawknet has reason to believe the funds that TOM Shipping was transferring through New York did not belong to TOM Shipping but rather belonged to MOS Overseas.  Hawknet has formally requested that TOM Shipping provide documents to explain the source of the funds that it was transferring and TOM Shipping has refused to do so.  Obviously, if TOM Shipping had nothing to hide, it would come clean and reveal the source of the funds.

## POINT III

### PLAINTIFF SHOULD BE GRANTED LEAVE TO FILE A SECOND AMENDED COMPLAINT TO ADD TOM SHIPPING AS A DEFENDANT WITH THE ATTACHMENT TO REMAIN IN PLACE PENDING SERVICE OF AMENDED PROCESS OF MARITIME AND GARNISHMENT ON BONY MELLON.

Hawknet submits simultaneously with its opposition to TOM Shipping's Order to Show Cause to vacate the attachment, a cross-motion seeking leave to file a Second Amended Verified Complaint to name TOM Shipping Vermittlung GmbH as a party-defendant on grounds that TOM is the alter ego of MOS Overseas Shipping Vermittlung GmbH, and of the other defendants named in the Amended Verified Complaint.

Federal Rule of Civil Procedure 15(a) provides that a party may amend its pleading once as a matter of course at any time before a responsive pleading is served. Otherwise, a party may amend its pleading only by leave of court or by written consent of the adverse party, and leave shall be freely given when justice so requires. Fed.R. Civ. P. 15(a).

The standard to be applied in deciding whether an amendment should be permitted under Rule 15(a) is a "lenient" one. *Tideline Inc. v. Eastrade Commodities, Inc.*, 2007 A.M.C. 252, 270 (S.D.N.Y. 1979), citing *Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 340 (2d Cir. 2000). This Court, in the specific context of a Rule B attachment action involving alter ego allegations[4], has previously noted that, generally,

---

[4] *World Reach* allowed plaintiff to amend its complaint to add a new defendant, BlueCoast Navigation S.A., on a theory that Blue Coast was the alter ego of defendant, ICI. *Id*. at *2-3. This Court permitted the

"leave to amend should be granted absent evidence of undue delay, bad faith, undue prejudice or futility… ." *World Reach Shipping Ltd. v. Industrial Carriers Inc.*, No. 06 Civ. 3756, 2006 WL 3316828, at * 2 (S.D.N.Y. Nov. 9, 2006), citing *Foman v. Davis,* 371 U.S. 178, 182 (1962). *See also Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.,* 404 F.3d 566, 603-04 (2d Cir. 2005) (Second Circuit jurisprudence holds that leave to amend should only be denied for undue delay, bad faith, futility of the proposed amendment or resulting prejudice to opposing party).

Here, there has been no bad faith or undue delay in seeking to amend the pleading. As set forth in the accompanying declaration of Keith W. Heard, Hawknet only achieved the attachment at issue within the last few weeks and the time since then has been consumed necessarily in further investigating TOM Shipping. That investigation has established how TOM has been used as a mere instrumentality and alter ego of MOS Overseas Shipping and the other defendants in the Majdpour group.

Hawknet also requests in its cross-motion that, if this Court is disposed to vacate the attachment on grounds that TOM Shipping was not named in either the Amended Verified Complaint or in the Process of Maritime Attachment and Garnishment, then release of the attached funds at BONY Mellon should be stayed. Hawknet requests such

---

proposed amendment where the operative allegations of the amended complaint by plaintiff, World Reach, included allegations that:

(1) BlueCoast "is the alter ego of ICI because ICI dominates and disregards BlueCoast's corporate form to the extent that BlueCoast is actually carrying on [ICI's} business and operations as if the same were its own, or vice versa";
(2) BlueCoast "acts as paying agent, or arranges for other non-parties to satisfy the debts and obligations of ICI";
(3) BlueCoast "has made hire payments to [World Reach] to satisfy ICI's debts and obligations"; and
(4) BlueCoast had been "intimately involved with the specific details of [the Charter Agreement]."

*Id.* at 3. This Court found that, on the basis of the foregoing allegations, the amended pleading gave "reasonable grounds for piercing the corporate veil and plainly state a prima facie case that Blue Coast is an alter ego of ICI." *Id.* at *3.

a stay until the Court rules on Hawknet's motion to further amend its Complaint to include TOM Shipping as a defendant and, assuming such motion is granted, until an amended Order of Attachment and Writ have been issued and a reasonable time for service of the amended Writ on garnishee, BONY Mellon, has elapsed.  Precedent for such a stay is found in Judge Wood's decision in *Tide Line*.  In circumstances comparable to those at issue here, plaintiff in *Tide Line* submitted detailed information substantiating its alter ego claims against defendant TransClear during the briefing and hearing process.  In granting the request for a stay of release of the funds, Judge Wood reasoned that:

> If the Court were to vacate the attachment now, after granting Tide Line's request to amend its Complaint, the entire proceedings would almost certainly be quickly repeated.  It seems that the interests of judicial efficiency would counsel in favor of keeping the attachment in place, in light of the amendments to the Verified Complaint.

2007 A.M.C. 252 at 271.

Where TOM Shipping had not even been formed at the time Hawknet filed its Amended Verified Complaint, but was only constituted thereafter in a transparent effort to avoid the liabilities of MOS Overseas, the interests of justice and efficiency counsel that this Court should utilize the mechanism of a stay employed by the *Tide Line* Court.

## CONCLUSION

## FOR THE REASONS SET FORTH HEREIN,

## TOM SHIPPING'S MOTION TO VACATE THE

## ATTACHMENT SHOULD BE DENIED AND

## PLAINTIFF'S CROSS-MOTION SHOULD BE GRANTED.

Dated:   New York, NY
        April 9, 2008

    BURKE & PARSONS
    Attorneys for Plaintiff
    HAWKNET, LTD.

By   /s/ Keith W. Heard
    Keith W. Heard (KH-8578)
    100 Park Avenue
    New York NY  10017-5533
    (212 )354-3800

To:   Eaton & Van Winkle
      Attn:  Michael O. Hardison, Esq.
      Attorneys for TOM Shipping
      3 Park Avenue
      New York, NY  10016-2078